PROVINCIAL HOUSE, INC v DEPARTMENT OF SOCIAL
SERVICES

Docket No. 97573. Submitted July 22, 1987, at Lansing. Decided
March 7, 1988. Leave to appeal applied for.

Plaintiff, Provincial House, Inc., and its subsidiary, Living Cen-
ters, Inc., brought a declaratory judgment action in the Ingham
Circuit Court against the Michigan Department of Social Ser-
vices seeking a determination of issues with respect to reim-
bursement of its expenses in connection with its participation
in the Medicaid program. The trial court, Robert Holmes Bell,
J., ruled that (1) defendant may not, based on plaintiff's sale of
its facilities at a gain, recapture excess depreciation expense
reimbursements from plaintiff, (2) plaintiff may not receive
reimbursement through calculation of the "experience modifica-
tion factor" which was in effect from July 1, 1979, until
September 30, 1980, and provided for adjustment of reimburse-
ment rates when cost projections and actual experience differed
by at least 1.5 percent, and (3) plaintiff may not receive reim-
bursement for extraordinary expenses incurred in closing down
its business. Defendant appealed from the trial court's first
determination and plaintiff cross-appealed from the court's
remaining two determinations.

The Court of Appeals held:

1. The proofs established that plaintiff had no notice that
recapture of excess depreciation expense reimbursements was
part of the state plan during the applicable time period. The
trial court's ruling that prior to February 15, 1982, the state
plan did not permit recapture of excess depreciation expense

REFERENCES

Am Jur 2d, Social Security and Medicare §§ 1223 et seq.; 1409 et
seq.

Supreme Court's views as to construction and application of Medi-
caid Act (42 USCS secs. 1396-1396s). 85 L Ed 2d 935.

What is related organization within meaning of 42 CFR sec.
405.427, limiting reimbursement of costs of services, facilities, or
supplies furnished to Medicare provider by such organization. 63
ALRFed 486.

reimbursements is not clearly erroneous and is supported by sufficient evidence.

2. Plaintiff waived review of the experience modification factor issue by failing to exhaust administrative remedies.

3. There is no statutory authority for the reimbursement of plaintiff's claimed extraordinary expenses and neither the applicable state plan nor the provider agreement authorizes such.

Affirmed.

1. SOCIAL SERVICES — MEDICAID — DEPRECIATION EXPENSES.

The state plans pertaining to the administration of the Medicaid program in effect prior to January 1, 1982, do not permit the Department of Social Services to recapture excess depreciation expense reimbursements from a health care provider based on the provider's sale of its facilities at a gain effective January 1, 1982.

2. ADMINISTRATIVE LAW — EXHAUSTION OF REMEDIES — APPEAL.

A plaintiff must first exhaust his administrative remedies, except where excused, prior to a review of the plaintiff's claim by the courts where an administrative grievance procedure is provided for the plaintiff's claim.

3. ADMINISTRATIVE LAW — EXHAUSTION OF REMEDIES — PUBLIC POLICY.

The doctrine of exhaustion of administrative remedies serves several policies: (1) an untimely resort to the courts may result in delay and disruption of an otherwise cohesive administrative scheme; (2) judicial review is best made upon a full factual record developed before the agency; (3) resolution of the issues may require the accumulated technical competence of the agency or may have been entrusted by the Legislature to the agency's discretion; and (4) a successful agency settlement of the dispute may render a judicial resolution unnecessary.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Robert W. Stocker, II*), for plaintiffs.

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *Janis Meija* and *William R. Morris*, Assistant Attorneys General, for defendant.

Before: DANHOF, C.J., and G. R. MCDONALD and
E. M. THOMAS,* JJ.

E. M. THOMAS, J. On September 10, 1982, plain-
tiffs, Provincial House, Inc., (PHI) and Living Cen-
ters, Inc., filed a first amended complaint for a
declaratory judgment against defendant, Michigan
Department of Social Services. Living Centers,
Inc., is a subsidiary of PHI and together they will
be referred to as plaintiff. Plaintiff, which formerly
owned a large number of nursing homes in Michi-
gan, sought determination of issues with respect to
reimbursement of its expenses in connection with
its participation in the Medicaid program. A dis-
pute has arisen between the two parties during
the completion of the final accounting for plain-
tiff's participation in the Medicaid program.

Following a bench trial, the circuit court ruled
that (1) defendant may not, based on plaintiff's
sale of its facilities at a gain, recapture excess
depreciation expense reimbursements from plain-
tiff, (2) plaintiff may not receive reimbursement
through calculation of the "experience modifica-
tion factor" which was in effect from July 1, 1979,
until September 30, 1980, and provided for adjust-
ment of reimbursement rates when cost projec-
tions and actual experience differed by at least 1.5
percent, and (3) plaintiff may not receive reim-
bursement for extraordinary expenses incurred in
closing down its business.

Defendant appeals as of right from the court's
determination of the depreciation recapture issue.
Plaintiff cross-appeals from the court's determina-
tion of the remaining two issues. We affirm the
circuit court's decision.

* Recorder's Court judge, sitting on the Court of Appeals by assign-
ment.

RECAPTURE OF DEPRECIATION

Dss asserts that PHI sold its entire business to Beverly Enterprises effective January 1, 1982, at a sales price in excess of the depreciated book value to the adjusted amount of $1,191,110.99. Dss contends that PHI received Medicaid funds premised, in part, upon the reported cost of operation. One of the costs of operation reported by PHI was depreciation of the nursing home facilities, thus, DSS reasons that PHI was overpaid Medicaid funds to the extent that it declared depreciation of facilities which have now been determined not to have depreciated in value but which actually appreciated in value. The circuit court ruled that PHI had shown that DSS' recapture of excess depreciation was not a part of the state plan prior to January 1, 1982, therefore, DSS could not assert such a claim against PHI. We agree.

Medicaid is a program established under Title XIX of the Social Security Act of 1935, 42 USC 1396 *et seq.* The program provides matching funds to states to provide medical assistance for the indigent, including payment for nursing home care. In 1966, the State of Michigan elected to participate in the program, pursuant to MCL 400.105; MSA 16.490(15) of the social welfare act, MCL 400.1 *et seq.*; MSA 16.401 *et seq.* Title XIX required that the participating state submit a state plan to the Department of Health and Human Services for approval. The state plan must meet certain conditions set forth in 42 USC 1396a(a)(1) to (44). Defendant is the state agency charged with administering the Medicaid program. Since the implementation of the program, defendant has submitted and received approval of numerous state plans.

In order for a health care provider, such as PHI,

to receive Medicaid funding, it is required to enter into a provider agreement. This agreement provides:

> All claims under the above programs shall be submitted on State approved invoices in accordance with applicable policies, rules and procedures established and published by the State, or contained in the State Plan approved by the U. S. Department of Health and Human Services.

It is the interpretation of this provider agreement between PHI and DSS for the years preceding December 31, 1981, which is in issue in this case.

To interpret the provider agreement and state plan we must examine how nursing care facilities have been reimbursed in Michigan. The method of reimbursement has varied since the beginning of the Medicaid program. Until September 1, 1973, nursing homes were reimbursed at a flat daily rate. From 1973 until July 1, 1978, facilities in Michigan participating in the Medicaid program were reimbursed allowable costs plus a profit factor up to a ceiling set annually by the Legislature in DSS appropriation acts. This methodology was referred to as the "retrospective reimbursement" system. This methodology was governed in part by the following documents: (1) the DSS binder entitled "Guidelines, Michigan Nursing Home Reimbursement Rates, Medicaid/Intermediate Care," (2) applicable state plans, and (3) DSS appropriations acts. The retrospective reimbursement methodology was intended to reimburse nursing homes in a manner reasonably related to their actual allowable costs from and after 1976.

Effective July 1, 1978, Michigan nursing care facilities of the type operated by plaintiff were paid prospectively using per patient per day rates based upon (1) historical costs both for physical

plant (known as the plant cost component) and routine services, as well as (2) nonplant costs (referred to as the variable cost component). This methodology is referred to as the "prospective reimbursement" system. Reimbursement under this system is fixed at the beginning of the reimbursement period and is not subject to retroactive change except in cases of provider fraud or withholding of required information. Importantly, there is no cost settlement at the end of the fiscal year under this system. If a nursing home's allowable costs are below the prospectively established rate, it keeps the difference. If its allowable costs exceed that rate, it is not reimbursed for those excess costs.

In order to permit recapture of depreciation, DSS must show that it either specifically contracted with PHI or placed PHI on notice that a precondition to receipt of Medicaid funds was the ability of DSS to recoup such funds at a later time based on erroneous depreciation of facilities. However, trial testimony showed that under either the retrospective or prospective systems recapture of depreciation was not part of the state plan and hence not part of the provider agreement or any applicable rule, policy, or procedure established by DSS during the applicable time period (prior to January 1, 1982).

The individuals who designed the retrospective reimbursement procedure testified that they were unaware that recapture of depreciation was part of the state plan; furthermore, the issue never arose during the program's design. Further, the cost reporting forms designed for use did not contain a provision for a calculation of depreciation expense reimbursement.

Dennis Madalinski, director of the long-term care rate setting section of the Bureau of Medicaid

Fiscal Review, which is part of DSS, acknowledged that there were no policy bulletins before December 21, 1981, stating that depreciation recapture was part of the Michigan Medicaid system and that a bulletin issued to providers in November, 1982, contained the first reference to recapture upon sale of a facility. However, Madalinski argued that the state plan effective January 1, 1976, did state that nursing homes shall adopt accounting procedures and uniform cost reporting in accordance with the principles of cost reporting approved by the Auditor General. He believed that this was a reference to the November 12, 1973, Seidman and Seidman letter which was part of the "blue book" distributed to providers. This letter, written by two designers of the retrospective reimbursement program, recommended that the state follow the Department of Health, Education and Welfare (now HHS) publication HIR-4, which contained the federal regulations governing reimbursement for Medicare services. Publication HIR-4 allowed recapture of depreciation under the Medicare plan. See also 42 CFR 405.415(f). Madalinski viewed defendant's mailing of the blue book containing the Seidman and Seidman letter and publication HIR-4 as giving providers notice that defendant intended to recapture depreciation expenses following the sale of a facility at a gain.

We do not agree. DSS attempts to incorporate the federal depreciation reimbursement scheme into the state plan via references in the Seidman letter. However, Madalinski's contentions have limited impact when we view the entire Seidman letter and the testimony of two accountants who helped design the retrospective reimbursement system. The Seidman letter referred to the Medicare reimbursement plan when it stated that the allowance for depreciation, contrary to publication

HIR-4, was restricted to the straight line method of depreciation with a useful life, in compliance with IRS guidelines. Both accountants who designed the program testified that this exception was intended to supersede the entire depreciation provisions of publication HIR-4, including recapture of depreciation. Additionally, one accountant testified that the recapture concept did not lend itself to the straight line depreciation method adopted. The Medicare cost accounting forms included recapture of depreciation expenses, while the Medicaid forms were silent on this issue. Dss witnesses testified that recapture was accomplished during and after this period following a number of nursing home sales. However, such testimony did not cite specific examples and thus lacked foundation and credibility.

We find that this testimony, along with our reading of the provider agreements and state plans during the 1973 to 1978 period, supports the trial court's determination that recapture of depreciation was not part of the state plan during this time period.

As for the prospective reimbursement period, 1978 to 1982, we believe that the testimony of Noble P. Kheder, deputy director, then chief deputy director, of DSS from 1978 to 1982, establishes that recapture of depreciation expense reimbursement was not part of the state plan until the DSS issued the "Michigan Department of Social Services Long-Term Care Prospective Reimbursement Plan Manual" on February 15, 1982 (distributed December, 1982). The 1979 state plan does give reference to 42 CFR 405.415(f), which allows for recapture of depreciation in the Medicare program. However, mention is made of this regulation in reference to the straight line depreciation method used in Michigan.

Section IV of the 1984 state plan contained the
following and was effective October 1, 1984:

> In all cases of sale or resale, the seller must
> notify the state agency at least 90 days in advance
> of purchase. The sale will not be recognized for
> reimbursement purposes until 90 days after notifi-
> cation. Provisions of 42 CFR 405.415(f) will be
> retrospectively satisfied at this time. Any excep-
> tion must be approved by the state agency.

It is clear from this that recapture of depreciation
expense reimbursement is now part of the state
plan. However, we agree with the circuit court
that prior to the February 15, 1982, DSS directive
the state plans did not permit recapture of excess
depreciation expense reimbursements.

We find that the proofs in this case established
that PHI had no notice that recapture of excess
depreciation expense reimbursements was part of
the state plan during the applicable time period.[1]
The trial court's ruling is not clearly erroneous
and is supported by sufficient evidence. MCR
2.613(C).

### EXPERIENCE MODIFICATION FACTOR

An experience modification factor was included
in the state plan effective July 1, 1978. The factor
was to be used when there was a difference of over
1.5 percent between the nursing home cost index
(NHCI) and the industry's actual costs. The NHCI is
a composite index used to predict the rate of
inflation of nursing home costs. The experience

[1] We make no ruling today as to when recapture of excess deprecia-
tion became part of the state plan. We only rule that during the
applicable time period (prior to PHI's sale of its nursing homes to
Beverly Enterprises effective January 1, 1982) recapture was not part
of the state plan and therefore not part of the applicable provider
agreements.

modification factor was in effect until September 30, 1980, when the Legislature set the factor at zero because of the cost implications to defendant. Defendant never did calculate what the experience modification factor should have been during the period in which it was in effect.

Phi contends that DSS should have implemented the experience factor and adjusted PHI's reimbursement rates for the period commencing July 1, 1979, through September 30, 1980. The circuit court ruled that as a matter of law the experience modification factor could not be calculated with any meaning from January 1, 1978, to September 30, 1980, and any claim for recovery based on such calculation was rendered moot by the passage of 1980 PA 315, § 93(3), which set the factor at zero. Further, the court concluded that even if the experience modification factor was calculable and failure to calculate is a basis for recovery, PHI did not pursue an administrative appeal of the prospective reimbursement procedure and thus had abandoned the issue.

We affirm the circuit court's ruling based on the latter. Generally, where an administrative grievance procedure is provided, exhaustion of that remedy prior to review by the courts is necessary except where excused. *Doster v Estes,* 126 Mich App 497, 514; 337 NW2d 549 (1983). The doctrine of exhaustion of administrative remedies serves several policies: (1) an untimely resort to the courts may result in delay and disruption of an otherwise cohesive administrative system; (2) judicial review is best made on a full factual record developed before the agency; (3) resolution of the issues may require the accumulated technical competence of the agency or may have been entrusted by the Legislature to the agency's discretion; and (4) a successful agency settlement of the dispute

may render a judicial resolution unnecessary. *Id.*, pp 514-515.

We believe that these factors support a finding that plaintiff has waived review of the issue by failing to exhaust administrative remedies. An appeal to the administrative body may have placed pressure on DSS to secure audited cost reports so that the experience modification factor could be calculated, thus rendering plaintiff's request moot. Additionally, an administrative appeal would have provided a more complete factual record for a clearer resolution of the issue. For these reasons, we decline to address PHI's contention that DSS should be required to perform the actual experience modification factor calculation and adjust PHI's reimbursement rates for the period commencing July 1, 1979, through September 30, 1980.

### REIMBURSEMENT FOR EXTRAORDINARY EXPENSES

Finally, PHI contends that should this Court allow defendant to recapture depreciation expense reimbursements, then PHI should be allowed reimbursement for extraordinary expenses incurred as a result of the sale of its facilities.

Since we find that DSS had no authority prior to 1982 to recapture reimbursement for depreciation expenses, PHI's argument must fail. Further, there is no statutory authority for such a reimbursement and neither the state plan nor the provider agreement authorizes such.

### CONCLUSION

For the foregoing reasons, we affirm the circuit court's December 5, 1986, judgment stating that (1) defendant may not, based on plaintiff's sale of its facilities at a gain, recapture excess depreciation

expense reimbursements from plaintiff, (2) plaintiff may not receive reimbursement through calculation of the experience modification factor which was in effect from July 1, 1979, until September 30, 1980, and (3) plaintiff may not receive reimbursement for extraordinary expenses incurred in closing down its business. No costs, neither party prevailing in full.

Affirmed.